IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER JAMES MCCARTY,<br><br>                          Petitioner,<br><br>vs.<br><br>SCOTT FRAUENHEIM,<br><br>                          Respondent. | No. 2:17-cv-02642-JKS<br><br>MEMORANDUM DECISION |

Christopher James McCarty, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  McCarty is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Pleasant Valley State Prison.  Respondent has answered, and McCarty has not replied.

I.  BACKGROUND/PRIOR PROCEEDINGS

On January 19, 2012, McCarty was charged with the murder of his father, Michael Wayne McCarty.  The information additionally alleged that McCarty used or discharged a firearm during the commission of the offense.  McCarty pled not guilty, denied the firearm use allegations, and proceeded to a jury trial on September 25, 2012.  Roughly three weeks later, the court found the jury deadlocked and declared a mistrial.

On February 23, 2013, a jury was sworn to retry the case.  On direct appeal of his conviction, the California Court of Appeals recounted the following facts underlying the charges against McCarty and the evidence presented on retrial:

In August 2011, [McCarty] and his brother, Daniel,[1] lived with their father, Michael, in Magalia, a small community east of Chico.  Their mother, Patricia, lived in a trailer park a few miles away.  She and Michael were divorced.  [McCarty] and Daniel also had a sister, Sarah, and nephew, Tyler, who sometimes stayed over at Michael's house.

The morning of the murder, the only people at the house were Michael, [McCarty], Daniel, and Tyler, who was six years old and sleeping on the couch when Daniel got up and went outside to clean his truck.  At some point that morning, Patricia called the house to tell Michael she needed to borrow one of the family's trucks.  According to Patricia's testimony, while she was on the phone with Michael, she heard him say to someone: "What are you doing?  Where are you going with that?"  Patricia claimed not to know to whom Michael was speaking and denied overhearing an argument while she was on the phone.  However, after the murder, Patricia told a friend, Amber Stromsoe, that Michael and [McCarty] were arguing about [McCarty] wanting to take a vehicle.  She also told Daniel's girlfriend's mother, Tanya Nogales, that Michael and [McCarty] were arguing about "a gun or keys or both."  During the phone call, the line went dead.  Patricia immediately called back, but no one answered.  When she called a third time, Daniel answered.  While he was outside vacuuming his truck, he had a cordless house phone near him and heard it ringing when he stopped the vacuum.  Patricia told Daniel she was talking to Michael but was disconnected, so Daniel went inside the house to give the phone to his father.

Meanwhile, Tyler awoke to a "loud noise" and was immediately greeted by [McCarty], who came from the hallway and was holding a rifle.  [McCarty] took Tyler outside the house, telling him: "Don't go back in there."  He then put the rifle in the back of his father's SUV.  The loud noise Tyler heard was the discharge of the rifle, a Browning semi-automatic hunting rifle chambered to fire a .300 Winchester Magnum rifle cartridge, a "fairly high-powered cartridge."  The rifle was fired from the hallway, at a distance no closer than about two feet from where Michael was standing in the doorway to his master bedroom.  The round that was fired entered Michael's skull near his right eye at a speed of roughly 3,000 feet per second, introducing a massive pressure wave that "exploded" his skull, sending blood, bone fragments, and brain tissue throughout the room.  While the bullet did not hit the cordless phone Michael was holding to his face when he was shot, the force of the skull explosion also broke the phone into pieces, disconnecting the call before Patricia could hear the rifle's report.  Michael's body collapsed, coming to rest partly in the bedroom and partly in the hallway.

As mentioned, [McCarty] immediately took Tyler outside.  Daniel, after answering the phone call from Patricia, passed [McCarty] and Tyler on his way into the house to give the phone to Michael.  Finding his father's body on the floor in the condition previously described, Daniel became "hysterical."  He did not remember talking to his mother on the phone again, but remembered going outside and asking

---

[1]     For clarity, this Court will, like the Court of Appeals, refer to McCarty's family members by their first names or their relation to McCarty.

[McCarty]: "What happened?"  According to Patricia, Daniel told her, "something happened to Dad," prompting her to immediately go to her neighbor Stromsoe's trailer and ask for a ride over to the house.  Stromsoe testified Patricia "came pounding on [her] door" and said she needed a ride to her ex-husband's house because he and [McCarty] were arguing when "the phone scuffled and disconnected"; Patricia was "hysterical" and "very worried that they were arguing, and needed to get there."

When Patricia and Stromsoe got to the house, [McCarty], Daniel, and Tyler were outside.  Daniel and Tyler were in front of the house, while [McCarty] was standing by himself, off to the side of the house.  Stromsoe described [McCarty's] demeanor as "emotionless."  Nogales and her daughter, Daniel's girlfriend, also came over to the house.  Apparently, Daniel had called Nogales's daughter and asked her to come get Tyler.  Nogales also described [McCarty's] demeanor as "very blank," whereas Daniel was "very irate and screaming his dad was dead."  At some point, Daniel grabbed [McCarty] and yelled: "What did you do?  What happened to Dad?"  A neighbor, who had also come over to the house, pulled Daniel off of his brother.  [McCarty] said nothing in response to this implied accusation.  According to Stromsoe, [McCarty] "didn't say anything from the time [she] arrived until the police came.  He was—there was no response, no emotion."  Patricia confirmed [McCarty] did not say anything, even when she tried to talk to him.[FN2]

> FN2.   Patricia also testified [McCarty] had been "very quiet" in the weeks
>        leading up to the murder and would "disappear" for four or five days at a
>        time, which was "not like" her son.  She attributed [McCarty's] behavioral
>        change to him not taking certain unspecified medication that had been
>        prescribed to him by a doctor.

Stromsoe called 911 after arriving at the house.  Sheriff's deputies arrived a short time later.  [McCarty] was again standing "[o]ff to the side," away from the others who were standing in a circular formation in front of the house.  He was wearing a green jacket that was removed during a pat-down search for weapons and placed on a fence next to where [McCarty] was standing.  Another deputy spoke to [McCarty], who directed the deputy to the rifle and admitted he placed the rifle in his father's SUV.  The rifle was loaded, but the safety was on.  Another deputy made the rifle "safe" by clearing the chamber of one unfired .300 Winchester Magnum cartridge and removing the rifle's magazine that had a three-cartridge capacity, but contained only two cartridges.  The rifle, magazine, and unfired cartridges were collected as evidence.  An expended cartridge of the same caliber was found on the floor in the hallway next to Michael's body and was also collected as evidence.  Subsequent testing confirmed this cartridge was fired by the rifle recovered from the SUV.  Ten latent fingerprints were lifted from the rifle and magazine.  Eight of the fingerprints matched [McCarty]; while the other two were unsuitable for identification, the fingerprint analyst was able to exclude Michael, but not [McCarty], as the source of the prints.  Deputies searched [McCarty's] bedroom and found a box of .300 Winchester Magnum cartridges in a bag under a couch in the room. The family's motor home was also searched.  On the bed in the motor home was a

3

green backpack and an open rifle case that was empty.  Mail addressed to [McCarty] was found on a counter in the motor home.  The green jacket was also collected as evidence due to the presence of what appeared to be blood stains, three of which were tested and confirmed to be blood.  Subsequent DNA testing revealed Michael's DNA profile matched that of the blood on the jacket.

[McCarty] was taken into custody and transported to the Butte County Sheriff's Office in Oroville, where he was interviewed by Detective Chris Nicodemus.  The details of the ride and subsequent interview are the subject of [McCarty's] first contention on appeal and will be discussed in greater detail when we address that issue below.

Statements [McCarty] made during four jailhouse visits were also admitted into evidence.  We discuss statements made during one of these visits in greater detail in the discussion portion of this opinion.  For present purposes, it will suffice to note that during a visit from Daniel, Daniel told [McCarty] he told someone, presumably from the District Attorney's office, he and [McCarty] "both got hit with the bat" and [McCarty] "never got to go to the hospital" to "get medicine for [his] damaged brain."  [McCarty] responded, "that had nothing to do with that day."  [McCarty] then admitted he was in the motor home the morning of the murder.  During another visit, after an unidentified visitor suggested [McCarty] claim temporary insanity, [McCarty] said he did not remember anything that happened except "walking in and seeing [his father] on the floor," to which the visitor replied: "Okay.  Good boy."  During a third visit, the unidentified visitor told [McCarty], "I've been praying for you," to which [McCarty] responded: "The devil just got a hold of me, I guess, you know, everywhere I go I was hearing voices . . . ."  During the final visit, the unidentified visitor told [McCarty] he needed "to think about . . . getting [himself] fixed," to which [McCarty] replied: "Well, if everyone would have been taking care of themselves and let me do what I needed to a long time ago, then I wouldn't be here and this all wouldn't have happened . . . ."

*People v. McCarty*, No. C073563, 2016 WL 3209306, at *2-3 (Cal. Ct. App. Jun. 1, 2016).

At the conclusion of trial, the jury found McCarty guilty of first-degree murder and found true all enhancements and allegations.  The trial court sentenced McCarty to an aggregate term of 50 years to life imprisonment.

Through counsel, McCarty appealed his conviction, arguing that: 1) trial counsel rendered ineffective assistance by failing to object on Fifth Amendment grounds to McCarty's adoptive admission of guilt while being driven to the police station after the shooting; 2) the trial court deprived McCarty of his right to confrontation by precluding the defense from asking McCarty's brother Daniel whether he shot his father; 3) the trial court erred in finding admissible

4

Stromsoe's testimony that McCarty's sister Sarah had said she feared that McCarty might hurt himself or someone else; and 4) the trial court erred by overruling objections that questions to the medical examiner were beyond his expertise and based on an improper hypothetical that assumed facts not in evidence.  The Court of Appeal unanimously affirmed the judgment against McCarty in a reasoned, unpublished opinion issued on June 1, 2016.  *McCarty*, 2016 WL 3209306, at *12.  McCarty petitioned for review in the California Supreme Court, raising only his ineffective assistance and confrontation claims.  The California Supreme Court denied review without comment on September 14, 2016.  His conviction became final on direct review 90 days later, when his time to file a petition for certiorari in the U.S. Supreme Court expired on December 13, 2016.  *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

McCarty timely filed a Petition for a Writ of Habeas Corpus in this Court on December 12, 2017.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, McCarty argues that: 1) trial counsel rendered ineffective assistance by failing to object on Fifth Amendment grounds to McCarty's adoptive admission of guilt while being driven to the police station after the shooting; 2) the trial court deprived McCarty of his right to confrontation and by precluding the defense from asking McCarty's brother Daniel whether he shot his father; 3) the trial court erred in finding admissible Stromsoe's testimony that McCarty's sister Sarah had said she feared that McCarty might hurt himself or someone else; 4) the trial court erred by overruling objections that questions to the medical examiner were beyond his expertise and based on an improper hypothetical that

5

assumed facts not in evidence; 5) the cumulative effect of these errors warrant reversal of his conviction.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

McCarty has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true.  *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

Ground 1.     *Ineffective Assistance of Counsel*

McCarty first argues that his trial counsel was ineffective for failing to object on Fifth Amendment grounds to evidence of McCarty's adoptive admission of guilt made during the drive to the station.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, McCarty must show that his trial counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

As the Court of Appeal determined in rejecting this claim on direct appeal, the thrust of McCarty's ineffective assistance claim is belied by the record, which reflects that McCarty was not questioned during the drive to the sheriff's office but rather was questioned at the sheriff's office after receiving the required *Miranda*[2] warnings and agreeing to speak to Detective Nicodemus. *McCarty*, 2016 WL 3209306, at *4. With respect to that interrogation:

> Detective Nicodemus testified he "explained to [McCarty] that there were three people in the home: A decedent, a six-year-old, and himself. The decedent did not kill himself and the six-year-old did not do that, leaving one person." The prosecutor then asked: "Did he deny any of that?" The detective responded: "No."

*Id.*

Because any objection under *Miranda* would have been overruled as not supported by the record, McCarty cannot show that counsel was deficient or that he was prejudiced by counsel's inaction. In raising this claim on direct appeal, McCarty altered the claim in his reply, arguing

---

[2]     *Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (a suspect has a constitutional right not to speak to police after he is arrested and given his *Miranda* warnings).

that, even if there was no *Miranda* violation, counsel should have nonetheless objected because "[d]ue process principles of fundamental fairness prohibit using post-arrest, post-*Miranda* warnings silence in the facts of accusations leveled by agents of the state because the warnings implicitly promise the prosecution will not do so." *McCarty*, 2016 WL 3209306, at *5.  The Court of Appeal concluded that McCarty forfeited his right to appellate review of that claim by raising it for the first time on reply.  *Id.*

As an initial matter, the Court of Appeal's forfeiture finding renders McCarty's transformed claim procedurally barred from federal habeas review here.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment).  Finding a claim forfeited where the claim was not raised before the trial court and is raised for the first time on appeal in reply brief is an independent state procedural ground for denying McCarty's claim that was well established and consistently applied in California's court.  *See, e.g.*, *People v. Tully*, 282 P.3d 173, 275 (Cal. 2012) ("It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party."); *cf. Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).  Because the state appellate court held that this claim was forfeited, it is deemed procedurally defaulted in these proceedings as well and rejected on that basis.

Moreover, even if McCarty's claim was properly before this Court, he is nonetheless not entitled to relief on the merits of it.  As a consequence of the right to remain silent recognized in *Miranda*, prosecutors are prohibited from commenting on a defendant's post-*Miranda* silence.

10

*Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976); *United States v. Lopez*, 500 F.3d 840, 844 (9th Cir. 2007) (prosecutor's comment on defendant's post-*Miranda* silence violates *Doyle*). The rationale for this rule "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) (citation and internal quotation marks omitted) (holding that prosecution may not use defendant's silence during case-in-chief). Here, however, the record reflects that McCarty voluntarily answered Detective Nicodemus's questions, and thus objecting to the evidence as improperly commenting on McCarty's silence would have been futile. Accordingly, McCarty cannot prevail on his ineffective assistance claim in any event.

Ground 2.        <u>*Confrontation Claim/Right to Present Third-Party Culpability Defense*</u>

McCarty next claims that his right to confrontation was violated when the trial court prevented defense counsel from asking Daniel on cross-examination whether he shot Michael. It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988). States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials. *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v.*

11

*Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Under these guidelines, this Court cannot find that the trial court's denial of McCarty's request was an abuse of discretion or unreasonable or contrary to federal law.  As an initial matter, the Supreme Court has not yet "squarely addressed" whether a state court's discretionary exclusion of evidence can ever violate a defendant's right to present a defense.  *See Moses v. Payne*, 555 F.3d 742, 758-59 (9th Cir. 2008) (considering challenge to state evidentiary rule allowing discretionary exclusion of expert testimony favorable to defendant); *see also Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (noting that no Supreme Court case has squarely addressed this issue since *Moses*).  Thus, the Court of Appeal's decision could not have

contravened clearly established federal law under AEDPA.  *Id.*; *see Wright v. Van Patten*, 552

U.S. 120, 125-26 (2008).

Moreover, to the extent that clearly established federal law is implicated by such a claim,

federal law requires that a petitioner demonstrate that the trial court excluded "trustworthy and

necessary exculpatory testimony."  *Cudjo v. Ayers*, 698 F.3d 752, 754 (9th Cir. 2012) (citing

*Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973).  A petitioner must show that the third-

party evidence was "inconsistent with" and "raise[d] a reasonable doubt of" his guilt.  *Holmes*,

547 U.S. at 327.  McCarty fails to meet this standard because, as the Court of Appeal reasonably

determined, there was no good faith basis to allow the excluded evidence.  As the Court of

Appeal persuasively reasoned:

> Here, defense counsel had no good faith basis to believe Daniel would have
> confessed to shooting his father.  Prior to Daniel's testimony, defense counsel argued
> [McCarty's] jailhouse conversation with Daniel provided such a basis.  In that
> conversation, as mentioned previously, Daniel told [McCarty] he told someone,
> presumably from the District Attorney's office, he and [McCarty] "both got hit with the
> bat" and [McCarty] "never got to go to the hospital" to "get medicine for [his] damaged
> brain."  [McCarty] responded: "[Y]eah, that had nothing to do with that day."  Daniel
> replied: "I thought that made you not yourself or something.  I don't know, it's just all
> messed up.  It's so sad, I just wanted you to get the care that you needed."  Then, after an
> apparently omitted portion of the conversation, the transcript of the conversation picks up
> with Daniel saying to [McCarty]: "[T]hey're pinning everything on you.  I don't even
> know what happened.  You just got Tyler out, and I don't know, I was out vacuuming my
> truck."  [McCarty] responded: "I was outside with you, too, remember?  I was cleaning
> my RV.  I remember that.  I saw you, you were right there.  You were right there in the
> driveway and I was at my RV, cleaning my RV out.  You were right there in front of the
> shop."  Daniel replied: "That's what I don't understand, they're saying that you done it."
> Based on this conversation, defense counsel argued to the trial court: "Daniel is
> clearly putting my client outside the house when it, it happened.  Aside from Tyler, the
> minor; my client; and Daniel, we have no evidence of anyone else being there.  And
> Daniel is saying that my client was outside the house.  I think it's a fair inquiry to ask
> him if he was inside the house when that shot was fired."  The trial court responded:
> "Well, that's a different question than what was proposed.  Do you have anything
> further?"  Defense counsel indicated he had nothing beyond Daniel's statements
> purportedly placing [McCarty] outside the house when the fatal shot was fired.  The trial

court denied defense counsel's request to ask Daniel whether he shot his father, but allowed him to question Daniel concerning his statements placing [McCarty] outside with him.

We conclude the trial court did not abuse its discretion in so ruling.  Even assuming Daniel's statements during the jailhouse visit can be read to place [McCarty] outside the house when the fatal shot was fired, they also placed Daniel outside the house at this critical time.  Therefore, they did not provide any good faith basis to believe Daniel would confess to shooting his father.  Nor would Daniel's statements in the conversation, or any other evidence presented during the trial, provide defense counsel with a means of proving Daniel shot Michael in the event he denied doing so.  Moreover, in light of the other evidence adduced during the trial, the jury was far more likely to interpret the conversation between [McCarty] and Daniel to place [McCarty] outside the house, in the motor home where the empty rifle case was recovered, before the murder, i.e., before removing the rifle from that case, entering the house with it, arguing with Michael while he was on the phone with Patricia, and then shooting Michael in the face with the rifle before removing Tyler from the house and placing the rifle in Michael's SUV.  Thus, far from providing a good faith basis to attempt to elicit a confession from Daniel, the conversation provided additional circumstantial evidence of [McCarty's] guilt in an already strong case.

Nevertheless, [McCarty] argues Daniel's "presence as one of a very limited number of persons who could have possibly committed the crime" and his "conduct at the scene before police arrived," combined with the foregoing conversation, "supported reasonable inferences sufficiently linking him to the offense to have the capacity to raise a reasonable doubt" as to [McCarty's] guilt under *Hall*, *supra*, 41 Cal.3d 826.  As a preliminary matter, these additional circumstances, now advanced to support the requested inquiry into whether Daniel shot Michael, were not presented to the trial court below.  "[T]he proponent of evidence must identify the specific ground of admissibility at trial or forfeit that basis of admissibility on appeal."  (*People v. Ervine* (2009) 47 Cal.4th 745, 783.)  This is because "[a] party cannot argue the [trial] court erred in failing to conduct an analysis it was not asked to conduct."  (*People v. Partida* (2005) 37 Cal.4th 428, 435.)  Because [McCarty] did not ask the trial court to take these additional circumstances into consideration in determining whether to allow defense counsel to ask Daniel whether he shot Michael, he has forfeited the argument the trial court "failed to apprehend such circumstances permitted reasonable inferences capable of raising a reasonable doubt."

In any event, even considering the combination of the jailhouse conversation between Daniel and [McCarty], Daniel's presence at the scene of the crime, and his conduct before the arrival of sheriff's deputies, this evidence does not provide a good faith basis for defense counsel's proposed question.  We have already concluded the jailhouse conversation does not supply any basis for believing Daniel shot Michael.  Nor does his presence at the crime scene, "absent any evidence, direct or circumstantial, linking [him] to the crime . . . ." (*People v. Panah*, *supra*, 35 Cal.4th at p. 481.)  Finally, Daniel's behavior following the murder is consistent with someone who found his father's deceased body and became "angry," "upset," and "hysterical" over the tragic and

14

unexpected loss, whereas [McCarty], described by witnesses as being "emotionless" and "very blank," did not respond when Daniel grabbed him and yelled: "What did you do? What happened to Dad?"  Thus, while [McCarty's] behavior after the murder supplied circumstantial evidence of his culpability, the same cannot be said of Daniel's behavior. Nor are we persuaded by [McCarty's] argument that "evildoers are often adept at manipulating and exploiting the more predictable assumptions and conclusions people are apt to draw from such reactions."  Indeed, this very argument tacitly admits Daniel's behavior was not consistent with his having murdered his father.  The suggestion Daniel might be an "evildoer," pretending to be upset while manipulating [McCarty] into incriminating behavior, is pure speculation and does not supply a good faith basis for asking Daniel whether he shot Michael.

The trial court did not abuse its discretion in preventing defense counsel from asking Daniel whether he shot Michael.  Nor did this ruling violate any of [McCarty's] federal constitutional rights.  (*See People v. Prince*, *supra*, 40 Cal.4th at p. 1243 [rejecting claim the proper exclusion of third-party culpability evidence violated defendant's constitutional rights].)

*McCarty*, 2016 WL 3209306, at *6-8.

Accordingly, McCarty is not entitled to relief on this claim.

Grounds 3, 4.  <u>*Evidentiary Errors*</u>

McCarty further contends that the trial court made two evidentiary errors.  The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  In this context, the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees enumerated in the bill of rights.  *Estelle*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  Indeed, the Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."  *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  In criminal actions, "[t]he States are free

15

to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution." *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 67).  Where a due process violation is alleged stemming from an evidentiary challenge, federal courts review such alleged due process violations for whether admission of certain evidence "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72.  A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005).  The "[a]dmission of evidence violates due process only if there are *no* permissible inferences the jury may draw from it." *Boyde*, 404 F.3d at 1172 (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991)) (internal quotation marks omitted; emphasis in original); *see also Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (noting that the Supreme Court has not made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of a writ of habeas corpus).

A.    _Alleged inadmissible hearsay_

McCarty contends that the trial court violated his constitutional rights when it admitted Sarah's out-of-court statement, made two days before the murder, warning Stromsoe to keep her son away from the house if McCarty was there because he "had been acting funny and had been off his meds" and Sarah was afraid he "[m]ight hurt somebody or himself."  The Court of Appeal agreed that the evidence was erroneously admitted, but nonetheless concluded that the error was harmless:

> Sarah's out-of-court statements to Stromsoe can be broken into four parts: (1) keep your son away from the house if [McCarty] is home; (2) [McCarty] has been acting funny; (3) [McCarty] has not been taking his medication; and (4) I am afraid [McCarty] might hurt himself or somebody else.  The first statement is not hearsay at all.  The fact Sarah warned Stromsoe to keep her son away from [McCarty] is circumstantial evidence of Sarah's mental state, i.e., her fear [McCarty] might harm Stromsoe's son.  The second and third statements set forth the reason for that fear.  If offered to prove the truth of the matters stated, i.e., [McCarty] was acting strangely two days before the murder and was not taking his medication, these statements would be inadmissible hearsay.  However, whether true or not, the fact these statements were made tends to circumstantially prove Sarah feared for the safety of Stromsoe's son.  Finally, the fourth statement specifically declares Sarah's mental state, i.e., her fear [McCarty] might hurt himself or someone else. Thus, the first three statements are potentially admissible as non-hearsay circumstantial evidence of Sarah's state of mind, while the fourth statement is potentially admissible under the state of mind exception to the hearsay rule.  Nevertheless, in order for these statements to be admissible either as circumstantial evidence of Sarah's state of mind or under the state of mind exception to the hearsay rule, Sarah's state of mind must be at issue in the case.  (_See People v. Kovacich_, _supra_, 201 Cal. App. 4th at pp. 884-889.)  Under no conceivable theory of this case was Sarah's state of mind two days before the murder placed in issue.
>
> Nor has the Attorney General provided any argument justifying admission of the challenged statements.  She instead argues any assumed error was harmless.  We agree.  While circumstantial in nature, the case against [McCarty] was incredibly strong.  Patricia was on the phone with Michael when he was shot.  While she denied Michael was arguing with [McCarty] at the time, her prior inconsistent statements made to Stromsoe and Nogales, properly admitted for their truth, revealed Michael was arguing with [McCarty] before the phone disconnected.  The argument was about [McCarty] taking a vehicle, or gun, or both.  The phone was disconnected when a high-powered round fired from a hunting rifle entered Michael's skull at supersonic speed, exploding his skull and shattering the cordless phone as Michael held it to his face.  The rifle's

17

report woke up Tyler, who was sleeping on the couch in the living room.  [McCarty] immediately emerged from the hallway and took Tyler outside.  While Tyler denied [McCarty] was holding a rifle when he did so, Tyler's prior inconsistent statement to one of the responding deputies, properly admitted for its truth, revealed [McCarty] was holding a rifle when he took Tyler outside.  [McCarty] himself admitted to placing the rifle in Michael's SUV after taking Tyler outside.  Daniel testified he was outside vacuuming his truck when he stopped the vacuum and heard a nearby cordless phone ringing.  After answering the call, which was Patricia calling back after being disconnected, Daniel walked past [McCarty] and Tyler on his way into the house to give the phone to his father, at which point he discovered Michael's deceased body partly in the hallway and partly in his bedroom.  Michael's blood was found on [McCarty's] jacket.  Ballistics matched the shell casing found next to Michael's body to the rifle [McCarty] placed in Michael's SUV.  [McCarty's] fingerprints were found on the rifle.  An empty rifle case was found in a motor home next to the house, along with a back pack and some of [McCarty's] mail, and [McCarty] admitted in a jailhouse conversation with Daniel that he was in this motor home that morning, which corroborates Patricia's out-of-court statements Michael and [McCarty] were arguing about [McCarty] wanting to take a vehicle and/or a gun.  [McCarty's] behavior following the murder was also incriminating, as previously discussed.  All of this provided a strong circumstantial case as to [McCarty's] identity as the shooter.

   Finally, as we describe in greater detail below, the medical examiner testified the end of the rifle's barrel was no closer than "a foot and a half" away from Michael when the fatal shot was fired, which estimate was based on the condition of the skin around the entrance wound.  Also based on the condition of the entrance wound, the medical examiner testified the shot was fired "straight on," as opposed to at an angle.  This evidence strongly negated any possibility the rifle was accidentally fired during a struggle for the weapon, and coupled with the evidence of the argument between [McCarty] and Michael immediately before the shooting and [McCarty's] post-shooting incriminating conduct, strongly supported the jury's conclusion [McCarty] killed his father deliberately and with premeditation.

   In light of this strong circumstantial evidence of guilt, we conclude there is no reasonable probability the result would have been different had the challenged out-of-court statements been excluded.  (See *People v. Guillen* (2014) 227 Cal. App. 4th 934, 1015 [prejudicial effect of erroneous admission of hearsay assessed under harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836].)  Moreover, even assuming defendant is correct the admission of these statements also violated his confrontation rights because he had no opportunity to cross-examine Sarah, we also conclude based on the strength of the case against defendant the error was harmless beyond a reasonable doubt.  (See *People v. Noguera*, *supra*, 4 Cal.4th at p. 623.)

*McCarty*, 2016 WL 3209306, at *8-9.

McCarty fares no better on federal habeas review.  With respect to his contention that the erroneous admission under California Code of Evidence § 1250 (statement of declarant's then existing mental or physical state) was unduly prejudicial, "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987).  McCarty's challenge to the trial court's evidentiary ruling raises no federal question because "alleged errors in the application of state law are not cognizable in federal habeas corpus."  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see also Cooper v. Brown*, 510 F.3d 870, 1001 (9th Cir. 2007) (claim of evidentiary error "fails to present a federal question cognizable on federal habeas review").  Thus, even though the trial court erred in its application of § 1250, such error is alone not a ground for federal habeas relief.  *See Estelle*, 502 U.S. at 67-68.

Moreover, this evidentiary error claim fails because the Court of Appeal's harmless determination is reasonable in light of the properly-admitted evidence against McCarty, which as detailed in the Court of Appeal's decision, was quite extensive.[3]  *See Brecht v. Abrahamson*, 507 U.S. 619, 622, 629 (1993) (harmless error standard applies to evidentiary errors).  An independent review of the record reflects that the appellate court's harmless determination does

--------

[3]        Other courts have admonished that harmless error review should not be confused with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. Sept. 8, 2015) ("Time and time again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict.").  The Court's reliance on the overwhelming evidence against McCarty in finding any error harmless does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors," including the overall strength of the prosecution's case.  *Id.* at 904 (citations omitted).

not contravene or unreasonably apply Federal law.  McCarty is therefore not entitled to relief on this ground.

B.    _Overruled objections to medical examiner testimony_

McCarty additionally asserts that the trial court erred by overruling various defense objections to blood splatter and trajectory testimony.  The Court of Appeal considered and rejected this claim on direct appeal as follows:

**A.**
*Additional Background*

The medical examiner, Dr. Thomas Resk, testified to being a physician and forensic pathologist with additional certifications in anatomic and clinical pathology.  Dr. Resk explained a "pathologist" is a doctor who studies the causes of disease.  A "forensic pathologist is . . . a pathologist who is specially trained in areas of wound interpretation and causes of death, timing of events related to death."  Dr. Resk also testified to having performed roughly 4,000 autopsies in his career, with "probably 97 percent" being forensic in nature.  Specifically referring to homicides, the doctor testified: "I've done hundreds of homicides of everything varying from gunshot wounds to stabbings, to hatchet murders, to strangulation.  I've done many, many hundreds of gunshot wound cases."  In such cases, his role as the forensic pathologist is to examine the body and provide "not only a cause of death, but the manner of death, whether it be natural, accidental, suicide."

After describing his credentials and experience, Dr. Resk testified to the different characteristics of skull wounds created by an impact from a projectile traveling at a high velocity, as opposed to one traveling at a lower velocity.  Dr. Resk also testified he examined Michael's body at the scene of the crime, examined Michael's bedroom for blood spattering, and also examined a bullet hole in the bedroom window.  Based on the condition of Michael's skull, Dr. Resk opined a bullet traveling at supersonic speeds entered Michael's skull near his right eye, introducing a massive pressure wave into the skull that "basically exploded" his skull, ejecting the right portion of his brain into the bedroom behind him and sending blood throughout the room.  The bullet then exited where the back of the skull would have been had it not been blown apart, resulting in the absence of an identifiable exit wound.  The doctor also testified, without objection, the forces acting upon the body in such a case can cause blood and other bodily material to be "blown back" toward the direction of the gunshot, referred to as "back spatter."

It was at this point in the prosecutor's examination of Dr. Resk defense counsel objected to the following question as calling for an answer outside the doctor's scope of expertise.  The prosecutor asked: "Well, can you tell anything about how far an item, say an item of clothing, was from [Michael's] head by the amount of back spatter that comes

20

back in that direction and gets on that clothing?"  After defense counsel's objection was overruled, Dr. Resk answered: "In part, I can tell that.  One—well, specifically for [Michael], I looked at the clothing to see if there was any material on his clothing certainly, as well as on everything forward, in front of him, and looked for that.  But in terms of actually determining the distance, the—one of the things that would be looked at, which I did not look at, would be the weapon, to see if there—one, if a weapon is available, if a weapon is there, and confiscated to look at the weapon itself, and see if there's any material on that—blood, tissue—see if there's any blood or tissue within the muzzle of the weapon itself.  And I did not do that at the scene."

The prosecutor then asked Dr. Resk to assume "the rifle was recovered and did not appear to have any blood or bodily material inside the muzzle or on the gun at all."  Defense counsel objected that the hypothetical assumed facts not in evidence, which was also overruled.  The prosecutor continued: "And so then suppose that a small amount of blood or bodily material was found on a jacket that was presumed to be in the direction of the back spatter, that is, where the gun was when it was fired, a small amount—one, two, or three small splotches of blood—can you tell anything about, about how far that individual was standing from [Michael] when the shot was fired?"  Dr. Resk answered: "I would be able to conclude from that, with that hypothetical, that the person—or the jacket, assuming that it was on a person, that the jacket was in the proximity of the, of the victim, of [Michael].  And as far as being within one [foot], five feet would depend on what the pattern of the back spatter was, how much spatter was around in front of the decedent, once we could establish how the decedent was most likely standing, sitting, laying down, whatever."  The prosecutor then asked the following clarifying question: "But, in general, what would be the range, if there's no blood on the rifle and a small amount on the jacket, what would be the outside parameters of the distance that you would, you know, find?"  Defense counsel objected that the question called for an answer outside the scope of the doctor's expertise, which was overruled.  Dr. Resk answered: "It's been my experience that with high velocity weapons we could be looking upwards of five feet."

Later, the prosecutor asked Dr. Resk about the bullet hole in the bedroom window, specifically, whether he could "tell anything at all from the beveling of that hole."  After another beyond the scope objection was overruled, Dr. Resk answered, the "external beveling" of the hole indicated the bullet "came from inside the house rather than from outside the house."  This answer prompted another beyond the scope objection that was also overruled.  Then, after eliciting testimony that the height of the hole in the window was "about five feet," the prosecutor asked: "And so does that indicate to you anything about the path that the bullet followed to get there?"  Another beyond the scope objection was overruled.  Dr. Resk answered: "The path would have been essentially a fairly straight trajectory rather than at an angle . . . .  But it would have been essentially at about the same height.  I would have expected the muzzle of the weapon that caused this to be at about the same height, about five feet or so."

A final beyond the scope objection was made to the following question: "And so were you able to make some sort of an estimate about the trajectory of the bullet?"  After the objection was overruled, the prosecutor clarified the question: "All things considered,

including the location and the height of the hole at the window, do you have an estimate about what sort of trajectory that bullet followed?"  Dr. Resk answered: "Based on my experience, training, and observation at the scene, as well as the autopsy, it's my opinion that [Michael] was standing—as opposed to being crouched or laying on the ground—he was standing essentially at normal height.  The person holding the rifle would have also been standing at essentially normal height; would have been an adult rather than a, you know, a child, a six-year-old child playing with a gun or something like that.  [¶]  Because of the trajectory, [Michael] was shot on the right side of his eye.  The bullet passed through his skull, having essentially exploded his skull, and continued its passage through the room in which [Michael] found himself, and then passed through the window that we've already looked at pictures of."

## B.
### *Analysis*

[McCarty] argues the blood spatter and trajectory testimony offered by Dr. Resk was outside the scope of his expertise as a forensic pathologist.  He further argues the hypothetical question asked by the prosecutor improperly assumed facts not in evidence.  We need not decide whether [McCarty] is correct because any assumed error was manifestly harmless.

As we have previously explained, while circumstantial in nature, the case against [McCarty] was very strong.  We decline to repeat each of the circumstances that together proved beyond a reasonable doubt [McCarty] shot his father with the rifle.  We do specifically address [McCarty's] contention the jury might not have found premeditation and deliberation without the foregoing challenged testimony concerning the distance back spatter might have traveled to reach [McCarty's] jacket and the likely trajectory of the bullet.  The back spatter testimony established [McCarty] could have been as far away as five feet when he shot Michael.  The trajectory testimony based on the hole in the window established the shot was fired at a horizontal trajectory.  Together, [McCarty] argues, this evidence allowed the jury to "infer premeditation and deliberation and reject the defense theories of accident or recklessness."

However, even if Dr. Resk lacked expertise in blood spatter and ballistic trajectory analyses, there is no dispute he possessed expertise in wound analysis.  Based on the condition of the skin around the entrance wound, and without objection, Dr. Resk testified the end of the rifle's barrel was no closer than "a foot and a half" away from Michael when the fatal shot was fired.  Also based on the condition of the entrance wound, and again without objection, Dr. Resk testified the shot was fired "straight on," as opposed to at an angle.  Moreover, the jury heard from another witness, also without objection, the window had a bullet hole at a height of "5 foot 3 inches," and the bullet came from inside the room and exited outside.  Based on this evidence, even without the challenged testimony, we have no doubt the jury would have concluded the bullet traveled in a horizontal trajectory, passing through Michael's skull, and exited through the window.  We further conclude Dr. Resk's unchallenged testimony that the end of the rifle barrel was no closer than "a foot and a half" away from Michael when the shot was

22

fired was more important to the jury's assessment of premeditation and deliberation than was his challenged testimony [McCarty] might have been as far away as five feet. This is because even if [McCarty] was that shorter distance away, he was still too far away for the rifle to have discharged accidentally in a struggle for the weapon. Finally, other circumstantial evidence also supported the jury's premeditation and deliberation conclusion, specifically, the fact [McCarty] and Michael were arguing when the fatal shot was fired and [McCarty's] incriminating behavior following the murder.

Simply put, even if the challenged evidence was improperly admitted, there is no reasonable probability of a more favorable result without the evidence.

*McCarty*, 2016 WL 3209306, at *9-12.

This evidentiary error claim likewise fails on federal habeas review because the Court of Appeal's harmless determination is reasonable in light of the properly-admitted and unchallenged evidence against McCarty. *See Brecht*, 507 U.S. at 622, 629 (harmless error standard applies to evidentiary errors). In rejecting McCarty's challenge on direct appeal, the Court of Appeal declined to address the merits of McCarty's claim and concluded that, even if the trial court erred in overruling certain of the defense objections to the medical examiner's testimony, McCarty failed to show prejudice that additional evidence. An independent review of the record reflects that the appellate court's harmless determination is neither unreasonable or in contravention of Federal law. McCarty is thus not entitled to relief on any argument advanced in support of these grounds.

Ground 5.        *Cumulative Error*

Finally, McCarty claims that the cumulative effect of the errors enumerated above warrants reversal of his conviction. The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also Whelchel v.*

23

*Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000).  "Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant."  *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)).  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant."  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers*, 410 U.S. at 298, 302-03).  Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted).  In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process.  *See Chambers*, 410 U.S. at 294.

As discussed throughout this opinion, McCarty does not demonstrate federal constitutional errors that would establish prejudice in the aggregate.  *See, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").  McCarty is therefore not entitled to relief on this claim.

24

## V. CONCLUSION AND ORDER

McCarty is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 19, 2020.

                                  /s/James K. Singleton, Jr.
                                    JAMES K. SINGLETON, JR.
                                    Senior United States District Judge